This is Rashid Casler, number 516-0035. You may proceed, sir. Thank you. May it please the court, counsel. My name is Daniel Janowski, and I represent the appellant in this matter, defendant Rashid Casler. Since this case is so fact-specific, I'm going to begin by offering a brief sketch of what happened in this case. My client, Mr. Casler, was in a hotel room in Carbondale when he opened the door to the hallway from the hotel room into the hallway. His testimony was that he had been drinking that night, felt like he was going to be sick, rushed towards the bathroom, accidentally opened the door to the hallway, and subsequently quickly closed it. And he testified he didn't see any police in the hallway. However, the police in the hallway, just a few steps down, did see him. So they quickly proceeded to knock on the hotel room door. I believe the police testimony was within about 15 seconds when they reached the hotel room. And about five seconds after that, someone answered. And so then, and it's not exact. Was it their testimony that he opened the door and stood there for two or three seconds and saw them, his uniformed officers? I don't recall a specific period of time, but I do remember that it was their testimony that he had opened the door. I don't believe his hand left the handle. He made eye contact and retreated back in. So I'll defer to the court on the period of time of two or three seconds. And so Robert was standing at the door, at the threshold between the hallway and the hotel room door. Without announcing themselves, they yelled to the bathroom, who's in there? And according to my client's testimony, he responded, Jakuba the King Williams. According to the police testimony, he responded, Jakuba King Williams. That's nearly identical names there. And that there's a difference in the testimony as to the period of time he spent in the bathroom and how many responses had gone back and forth. However, we do know that after he exited the bathroom, Officer Draper recognized him and asked him, aren't you Rasheed Kasler? At which time my client looked away or looked down and submitted into custody of the police due to an outstanding warrant. And so this case rests on a series of facts that all must be taken as true in order to prove the second element of the statute that my client intended to prevent his apprehension on warrants. And that's how it's charged in the charging instrument, apprehension on warrants, by providing a false name. The false name isn't at issue here. And so while this case is viewed in light most favorable to the state, we have to believe three facts that are true. The first is that my client saw the police in the hallway when he opened the door. The second is that my client knew it was the police asking who was in the hallway, even though they didn't announce themselves from the threshold. Even though the person standing by the door would have obviously saw the uniformed officers. And even though he must have thought at that time if it was the police that the name Jakuba King Williams was one sufficient to satisfy the police and send them on their way. And the third fact that we have to take as true is that my client knew that he had an outstanding warrant or warrants as it was charged. Even though the record shows that his testimony was that he didn't know he had any outstanding warrants. And it's not on the record what the warrant was, whether it was for a missed status or payday or if it was for some, you know, substitute criminal charges. And so if any one of these isn't true, then the whole inference fails that he had intended to evade his capture. Because if he didn't see the police in the hallway, as his testimony was, then he wouldn't have had any reason to believe it was the police asking who was in the bathroom. Because he had testified that he believed it was his friends that were in the hotel room. Even if he saw the police, we also have to believe that he knew it was the police who didn't announce themselves and who 20 seconds later after seeing them in the hallway would have been asking who was in the bathroom. And fairly, if he didn't know he had any outstanding warrants. Didn't they command him to open the door? After they heard the name, I believe it was whenever they commanded, you know, open the door. If you don't open the door or if I hear you flush, I'm coming in. Because, you know, the police officers testify that usually that's a place that people hide when they're trying to evade capture. And so, Mr. Kedward. Didn't they also ask for an I.D. through the door? I believe they asked for his name. The officers testified that they asked for his name. And then eventually asked for where he was from. In which case, the officers testified he responded that he was from Virginia. In which case, they ran his name. And that's when Jakuda, the King Williams, came up as a, you know, non-entity. That there was nobody by that name. And they ran that name on the warrant search? I'm not sure if the record shows. They did it over dispatch. They did it. The Jakuda, the King Williams, obviously. I don't know how they ran that because it came up as a non-entity. But as soon as Officer Draper saw my client leave the bathroom and said, aren't you Rasheed Casler? That's whenever somebody picked that up at dispatch and ran that name on a warrant search. And that's when it showed that. But they also ran Jakuda, the King Williams. They could have. I just know that the search that they ran showed nothing. It didn't show anybody by that name existed. When did they call for backup? I believe it was at some point after knocking on the door but before he had exited the bathroom. It was whenever they had called for backup. There's about a 24-minute period of time between the time that the officers knocked on the door and the time that they had my client under arrest. So sometime within that 24 minutes is whenever backup had arrived. Had backup arrived when he finally emerged from the bathroom? I can't recall at this time whether backup was there whenever he exited the bathroom or if they had arrived sometime after. I can't recall. I can't recall what that timing was. So it's our argument that this is not lawmaking foul. All three of those are present here to sufficiently prove my client guilty beyond a reasonable doubt. And the second issue I'd like to bring to this Court's attention is the case of People v. Taylor, a second district case cited in our brief for the proposition that in order to prove a defendant guilty of obstruction of justice, that there must be an actual material impediment to that investigation, to that meeting of justice. In the Taylor case, the defendant there had given a false name to officers after they had been recognized by him. The officers were patrolling in Bloomington. They saw the defendant on the sidewalk. They recognized him. And they knew he had an outstanding warrant. They had his picture tucked up in the visor of their patrol car, got out of the vehicle, approached him and said, who are you? To which he responded with a fake name. And the officers knew it wasn't him, so they persisted with it. I believe the facts in that case were that eventually one of the officers said, hey, defendant. He was looking down. He looked up and said, yes, in which case he knew he hadn't been had at that point, and ended up submitting to the police officers. And so the whole occurrence in that fact pattern was about 10 minutes from the time that the police officer saw him on the sidewalk to the time he took him into custody. They knew who he was to start with in that case, correct? Yes, yes. And so in this case, they didn't know. They didn't know who he was to start with. There was a police officer testimony that whenever my client had opened the door, that they had recognized him. They couldn't place him. They knew it was somebody they had dealt with. The officer director says somebody knew it was somebody he had dealt with before. You didn't say his name, aren't you? So it was his actual name? After getting into the bathroom. So in that split second or three seconds that the door was open and the officers made eye contact with him, according to their testimony, was whenever Officer Draper recognized him. The testimony was that he couldn't have given a name at that time, and they didn't know that he had any warrants out for his arrest. Also different from Taylor. But it was whenever he left the bathroom, whenever Officer Draper said, and you could see him head on when he said, aren't you Rasheed Kasner? At which point, he didn't persist with the fake name. He looked down and he looked away. Quit making eye contact with him whenever they eventually found out. He didn't have a name? No. He just was kind of similar. Knew he had been had and kind of looked down. When Taylor, they knew who they were looking for. They had his picture on the visor, correct? Yes. And they knew he had a warrant? Yes. And so I think that that fact actually makes this case a little bit stronger in the fact that, number one, whenever my client gave the name Jakuta the King Williams, I think just the nature of that name itself isn't one that would prove that if you were trying to evade the police, that's not a name that you're going to give the police officers that are going to make them say, oh yeah, nothing to see here. We're going to move along. And the second is that since the police in all the majority of the obstruction cases that have been cited in both briefs deal with the fact that police officers were actively looking for somebody, and so the giving of a fake name could potentially send them on a different way. They were actively looking for somebody to arrest. Giving the fake name could actually send them on a different case. Whereas here, they didn't know he had a warrant. So therefore, by giving the fake name, even if he knew his officer, even if he gave him the fake name, that it couldn't have impeded the investigation because they weren't investigating him. They weren't looking for him at that point. Well, he didn't know that, though. That's what his point was, was that he didn't know that they were out looking for him. He didn't know it was the police officers asking that. He didn't know he had any warrants out for his arrest. At some point he looked out. I don't remember if it was the door or the window and said, oh, no, or some other words of exclamation. Yes. And realizing it was the police. At what point did that happen? That would have been the initiative. Whenever he opened the door, the testimony was that he said, whoa. Oh, okay. And so that could be taken either as, I see the police, I'm saying, whoa, or, like I said, this testimony was he had been drinking that night, felt sick. And he said, whoa, this isn't the bathroom. He retreated back in and subsequently ended up in the bathroom. And there was testimony. Okay. And there was testimony from my client and from one of the officers that said that they saw human waste in the bathroom, indicating that he didn't use even one officer to testify. He didn't see anything. All right. Thank you. Thank you. May I please record? Also. Jennifer Camden on behalf of the people. I'll start with the first issue, the sufficiency of the evidence issue, and address some of the factual issues raised today. First, when Draper knocked on the door of the hotel room, which he did because the odor of cannabis wafted out of the door as the defendant slammed it, he did announce that he was a police officer, and that's at the record site, page 264 and 65. Also, it's Draper's account of the ensuing conversation that he had with the defendant through the closed bathroom door that should be credited rather than the defendant's. Again, this conversation occurred while the hotel room door was open, but while the bathroom door was closed. And it was through that door that Draper called out, anybody in the bathroom, identify yourself. Draper got some sort of a response. He didn't say what. And then Draper said, what are you doing in there? Draper said that the defendant reported he was using the facility. And Draper said, okay, identify yourself. And the defendant eventually identified himself as Jakuta King-Williams. And it was then that Draper yelled to open the door so he could see the defendant and what he was doing, not to flush the toilet, and that if the defendant flushed, Draper would come in and seize him. It was then that Draper asked the defendant for ID, and the defendant said that he didn't have any and he was from Virginia. So there were multiple verbal exchanges and demands for identification before the defendant gave the false name, and then there were additional exchanges before the defendant gave false information regarding whether he had ID. There was, in fact, an Illinois ID card of the defendant's in the hotel room. And by the way, the officers did run the false name Jakuta King-Williams, and that's at Record Site 234. So from that evidence, the irrational jury could have concluded that the defendant knew he was talking to a police officer through the bathroom door, not that he was joking around with a friend. And then the state also argues that there was sufficient evidence from which a jury could have found that the defendant knew of the existence of the warrant and gave the false name to avoid apprehension on it. Moving on to the second issue of whether the state was required to additionally prove that the defendant materially impeded law enforcement in some way, the state argues that the state was not required to prove that additional element, and that can be seen by looking at the plain language of the obstructing justice statute itself, which states that a person who furnishes false information with a specific intent is guilty of obstructing justice with the intent either to prevent someone's apprehension or with the intent to obstruct someone's prosecution or defense, that with that intent, given false information, is itself obstructing justice. And the jurors were so instructed. Was he from Virginia? I beg your pardon? There was some answer. He said, well, I don't have my ID because I'm from Virginia. Was there something about he really had lived in Virginia at some point? Yes, he really had. And Draper testified to that. And, of course, that shows that the defendant must have said that because how else would Draper have known that the defendant really was from Virginia? So he really was. But he also said, told Draper, that he didn't have ID on him, which we know was false because there was an Illinois ID card in his sweatshirt, which was on the bed of the hotel room. The Taylor case did not require the state to prove that the defendant materially impeded law enforcement. And the state does go on to argue that even if Taylor has some amount of persuasive authority, there was evidence from which a rational jury could have found that the defendant did materially impede law enforcement. But I want to talk about Taylor for a minute because in that case the defendant was charged with obstructing justice based on the theory, the factual theory, that he committed an act of obstructing his identification. In other words, the defendant in this case was charged with the physical act of furnishing false information. The defendant in Taylor was charged with an act of obstruction. So the court in Taylor was forced to try to define what the word obstruction means in terms of the verb, the act, that the defendant was accused of doing. In this case, the defendant was charged with the act of furnishing false information. There's no ambiguity as to what that means. The defendant doesn't argue that the phrase furnishes false information is ambiguous or requires any interpretation. Now, it was in the course of interpreting the word obstruct in Taylor that the appellate court in Taylor went on to consider how the Supreme Court had defined the word conceal in the obstructing justice statute and the word obstruct in the different statute of resisting or obstructing a police officer. And that's how the court in Taylor determined that to commit the act of obstructing, charged under obstructing justice, one must materially impede law enforcement. But the defendant in this case was charged under a different section of the statute, was charged with a different act. And so that's the distinction between this case and Taylor. Again, Taylor is also factually distinguishable because even though, as the defendant notes, both events ended in arrest within minutes, the arrest in this case took place after the defendant ended a standoff through a closed door. I mean, a closed door is literally a material impediment. Also, as Your Honor pointed out, the officer in Taylor did know who the defendant was with almost 100 percent certainty, whereas the officer in this case actually was fooled by the fake name. They ran it. And I'd argue that this case is more like the Davis case, which is cited in the People's Brief, in which the appellate court noted that furnishing false information carries the high potential of compromising an investigation, which is why the crime can be completed at the moment that the false information is provided. Again, showing that no additional element of material impediment must be shown. Now, the defendant would argue that Davis predates the Baskerville case, but Baskerville concerned a different statute. That was that resisting or obstructing a police officer statute. It's about a different statute entirely. Davis is still good law for the proposition that a false statement can compromise an investigation instantly. Also... What are the ways in which the false statement materially impeded this investigation? Well, Your Honor, if the state was required to prove material impediment... Assuming we agree with it. Yes. If it was, then obviously that prolonged the amount of time that Officer Draper was required to stand in the threshold of this hotel room, outnumbered by four people visible to him in the hotel room, plus at least one more. He didn't know how many people were in the bathroom, of course, because the door was closed. But at least one more person in the bathroom. His assisting officer had gone down to the manager's office to try to talk to the hotel manager. So apparently for some period of time he was all alone outnumbered up there. A backup did arrive before the defendant left the bathroom. And by the way, the defendant only left the bathroom after being told that police weren't leaving until he came out and showed himself. So in the Chanel case, which is cited in People's Brief, the court notes that a jury could have found that the officer was at risk due to the defendant's actions. I'd argue that the same is true here, that a jury could have so found based on the defendant's insistence of remaining behind the door. Of course, the fact that the officers had to run that fake name, one could argue that that was a material impediment also. Could it also include the potential danger of not knowing what danger existed behind the door? Of course. One or more persons plus firearms? I'm very petrified that he thought that the person was in the bathroom flushing the cannabis that he smelled. And he didn't mention a specific threat that he believed that there might be a gun. But of course, he may have thought that. Was that a potential danger that police officers faced? Of course, Your Honor. And so, and again, in the Chanel case, the appellate court spoke favorably about the implications that can be about officer safety that can be drawn any time that there's a refusal to obey a police order. In that case, it was the order to get out of the car at a traffic stop. But the same would certainly hold true here. This was a standoff that went on for some period of time. I mean, Viper was yelling. And the defendant didn't come out until he was told that essentially that it was useless and that the officers weren't leaving. I think there's some more. So the fact that the situation got to the point where there was a standoff and where more police officers were on the way to assist Draper at that point, I think a reasonable jury could have found that that constituted a material impediment to the apprehension of the defendant also. Thank you, counsel. Thank you. Rebuttal. Yes, Your Honor. Rebuttal. I'd just like to address some of the case law here, I think, this morning. The first is the Chanoff case I believe is highly distinguishable from this case in regards to the officer's safety concern. In Chanoff, the officer was placed in danger because at the traffic stop, he had told the defendant to exit the vehicle. She refused to do that. He had tried to open the door, reach in and try to unbuckle her safety belt, at which point she was driving away. And so at that point, the officer was placed in danger. Here, there was nothing in the record other than the officer thinking that my client was flushing contraband. I don't believe that there was ever anything to say that he felt like he was in danger of being attacked. So I believe that that's a distinguishing factor between Chanoff and this case. Secondly, the Taylor case, Paragraph 6 of the Taylor case, I believe shows that the statute and the charge of question here are exactly the same here. In Paragraph 6, Taylor was charged with obstructing of justice by furnishing false information to Mott, giving the false name and telling Mott, the police officer, that he did not have any identification on him and resisting a peace officer. However, when we go to the analysis section here in Paragraph 8, it says, on appeal, Taylor argues that the evidence was insufficient to support his conviction for obstruction of justice, not the obstruction of a peace officer. And so the Taylor case, the Comich case from the Illinois Supreme Court, as well as Baskerville, I believe they all have to be read together because this just shows the incremental development of the case law in this area. The Comich case dealt with obstruction of justice, but the concealing of evidence in an attempt to evade an arrest, in which case the defendant in Comich, he threw a crack pipe over a fence while he was fleeing from police officers. It took the police officers, I want to say 20 seconds. It wasn't a very long period of time to recover the crack pipe, in which case the Supreme Court said, you have to, you know, that this act of throwing the crack pipe over isn't concealing evidence, you know, in an attempt to evade arrest because there was no material impediment. It didn't take the police very long. Evidence wasn't going anywhere. And so therefore, that's where this material impediment language first comes in. Then comes along Baskerville, which is a slightly different statute because that was a resisting or obstruction of a peace officer, which requires slightly different elements, the three of them. The first is you have to obstruct, in which case there they defined what obstruct meant. And then they went on to say you have to have a peace officer and you have to know that they're acting within the line of duty there. And so the issue was what does obstruct mean within the statute of obstruction of a peace officer, in which case they said there has to be some type of material impediment. Then comes along Comidge that takes these two ideas, one of the obstruction of justice requiring a material impediment, as well as the definition of obstruction as a material impediment from Baskerville, using a slightly different statute, and kind of melds these two together to say, in order to obstruct justice whenever you're furnishing false information, there has to be a material impediment. And so they actually came out in just that order. Comidge was 2011. Baskerville came out in 2012. And even in the decision in Taylor, they say, we've asked that the parties do this recent Illinois Supreme Court decision to discuss this new area of law. And so they said that's where this material impediment comes in, this language comes in, even under the obstruction of justice, in which case they applied it here in Taylor. And so I think that that's why Taylor should be, you know, should have some authority, even though it's from the 2nd District in this case. So I see my time is limited here. If there's any further questions, I'd be happy to ask them. Okay. Thank you for your arguments, counsel. We'll take this matter under advisement and render a decision in due course.